UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 12-11531-RGS

ROBERTO RODRIGUEZ

v.

JETBLUE AIRWAYS CORP.

MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

August 18, 2014

STEARNS, D.J.

Roberto Rodriguez,[1] a Boston-based flight attendant terminated by JetBlue Airways Corp. (JetBlue) in October of 2011, brought this suit against JetBlue alleging (1) disability discrimination in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., and Mass. Gen. Laws ch. 151B, (2) discrimination and retaliation in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601 et seq., and (3) common-law breach of implied contract.[2] JetBlue now moves for summary judgment on all claims, alleging that it terminated Rodriguez "in connection with JetBlue's legitimate, non-discriminatory understanding

---

[1] Rodriguez is sometimes referred to in various JetBlue documents as "Robert Rodriguez" or "Roberto Rodriguez Taveras."

[2] Rodriguez's claims for retaliation under the ADA and under state law were dismissed earlier in the litigation. *See* Dkt. # 19.

that [Rodriguez] failed a 'reasonable suspicion' Breathalyzer test for alcohol use on October 13, 2011, in violation of JetBlue policies, as well as Federal Aviation Administration (FAA) and Department of Transportation (DOT) regulations." Def.'s Mem. (Dkt. # 54) at 9.

## BACKGROUND

The plausible facts, viewed in the light most favorable to Rodriguez as the non-moving party, are as follows. Roberto Rodriguez is a thirty-two year old male who was diagnosed with epilepsy at age fourteen. Rodriguez was employed by JetBlue as a "full-time Inflight Crewmember" (flight attendant) from January 7, 2009 to October 31, 2011. On the morning of October 13, 2011, Rodriguez was scheduled to crew a flight from New York to Boston, departing from John F. Kennedy Airport at 7:23 a.m. Rodriguez and the other assigned crewmembers (S.M. and M.M.) were expected to report to work at around 6:45 a.m. The three crewmembers overnighted at a hotel in the borough of Queens. At 7:00 a.m. on October 13, 2011, Rodriguez telephoned JetBlue crew services to report that he and S.M. had been delayed, having not received a requested 5:30 a.m. wake-up call from the hotel concierge. Rodriguez and S.M. took a taxi to the airport, arriving at their assigned aircraft at 7:15 a.m. M.M., the other assigned crewmember, was already on board along with Awilda Ayala, an "inflight

team leader," and David Rodriguez,[3] another crewmember and "inflight supervisor." Ayala and David R. had boarded the plane to prepare for preboarding in Rodriguez and S.M.'s absence.

Rodriguez boarded the plane, stowed his personal luggage, apologized for being late, and thanked David R. for starting the boarding process. Rodriguez then began to perform crew duties at the back of the aircraft. Meanwhile, Ayala interacted with S.M., whose demeanor she found odd and evasive. Ayala smelled alcohol on S.M.'s breath and texted David R. (who was in the back of the plane with Rodriguez), "David, her breath, come to the front." Ayala Dep. (Dkt. # 65) 50:13-15.[4] David R. responded, and after speaking with S.M., decided with Ayala to order Rodriguez and S.M. off the plane and have them tested for alcohol. Ayala, David R., Rodriguez, and S.M. exited the plane around 7:30 a.m. and waited in the employee lounge for Ahmed Malik, a JetBlue Breathalyzer technician, to

---

[3] David Rodriguez will be referred to as "David R." to avoid confusion with the plaintiff (to whom he is not related).

[4] Ayala testified that she did not smell alcohol on Rodriguez's breath when he boarded the aircraft, *id.* at 41:5-7, but that she did smell alcohol on his breath when they exited the plane together. *Id.* at 151:8-15. Her testimony is consistent with a "Signs and Symptoms Report" form that she and David R. completed on October 13, 2011, in which Ayala wrote, "[a]s I was walking with Roberto, I noticed the odor of alcohol. David had noticed his nervousness on the A/C while he was speaking to him." Dkt. # 58-18 at 2.

arrive.  David R. called Michael Roldan, an "Inflight Duty Lead" at JetBlue, to report the situation.[5]

## DISPUTED FACTS REGARDING THE BREATHALYZER TEST

### *Rodriguez's Account*

According to Rodriguez, as he and S.M. exited the plane, Ayala and David R. attempted to take their bags.  Rodriguez objected, explaining that he needed his medication.  Rodriguez was permitted to keep his bag, *see* Rodriguez Dep. (Dkt. # 62-3) 62:21-24, but at some point "was informed by

---

[5] At 8:30 a.m. that morning, Roldan sent an email to senior management at JetBlue, copying David R. and Ayala, writing:

> BOS based CM's [S.M.] & Rodriguez Taveras 83114 both received [no-show violations] this morning in JFK for flight 1002 JFK-BOS.  Both CMs arrived to the AC at 07:15 for a 07:23 departure. . . . Crew services first received a call notifying that they were missing at 7:05 from JFK Operations.

> Once I found out that we were missing these two CMs, I sent David Rodriguez and Awilda Ayala to gate 14 to further investigate their whereabouts and to pre-board . . . When the CM's arrived to the AC, Awilda noticed an odor of alcohol from both CMs while David Rodriguez reported that both CMs seemed extremely nervous.

> At this point, David and Awilda brought these two CMs to the lounge and contacted Anti Drug and Alcohol.  At this time, we are waiting for the on-call AD&A CM Ahmed Malik to arrive to JFK for testing.  David and Awilda will be sending their re-cap once testing is completed.

Dkt. # 58-13 at 3.

[David R. and Ayala] that they would not allow [him] to eat or drink anything until [Malik] arrived." Rodriguez Aff. (Dkt. # 62-2) ¶ 30. Rodriguez said that he had to "take his medication soon and required water to do so," but David R. and Ayala "continued to refuse [him] water and permit [him] to take [his] medicine." *Id.* ¶ 31-33. Rodriguez "repeatedly pled with [David R. and Ayala] to permit [him] to take [his] medicine because he was epileptic and could not miss a dosage." *Id.* ¶ 34. Rodriguez began experiencing ringing in his ears and dizziness and told Ayala that he was not feeling well. Malik (the Breathalyzer technician) eventually arrived, and S.M. was the first to be tested. Her initial test was positive. Ayala left the lounge to call airport security out of concern for S.M.'s negative reaction to the test results (she was allegedly berating Ayala). Fifteen minutes later, S.M. failed a confirmation test. Rodriguez was then instructed to report to Malik to be tested. Rodriguez states that he recalls walking into the testing room, where he lost control of his body and collapsed. Rodriguez states that he has "no recollection of ever taking a breathalyzer test or signing any document to agree to a breathalyzer test." Rodriguez Aff. ¶ 43.[6] He revived and was eventually taken to Jamaica Hospital by emergency paramedics.

---

[6] Rodriguez's affidavit contradicts his prior sworn statement (in his

### *JetBlue's Account*

Ayala and David R. state that they accommodated Rodriguez's request to keep his bag and did not prevent him from taking his medication.[7] According to JetBlue, Rodriguez took a Breathalyzer test at 8:48 a.m. as reflected in a Breathalyzer "test result printout" attached to an Alcohol Testing Form (ATF).[8] The ATF records a test on October 13, 2011, at 08:49 a.m., with a blood alcohol result of .048. *See* Dkt. # 58-19. The form contains the signature of a "Roberto Rodriguez" under the statement "I certify that I am about to submit to alcohol testing . . . ." *Id.*[9] A second signature line at the bottom of the ATF (to be completed by the employee if the blood alcohol result is .02 or higher) is blank. The "remarks" section of

---

EEOC charge) that "*after* the initial test, Rodriguez suffered an epileptic seizure." Dkt. # 58-23 at 2 (emphasis added).

[7] Ayala wrote in an email that same day that both Rodriguez and S.M. "were requesting and drinking water (both had their own). . . . David came in and informed them that he had just been advised that they were not to drink water or chew gum. Roberto immediately complied and set the water aside." *See* Dkt. # 58-13 at 2.

[8] Rodriguez moves to strike the Breathalyzer test result, however the ATF is properly admissible under Fed. R. Evid. 803(6).

[9] Rodriguez disputes that he signed the form, but has no explanation for why anyone would have forged his signature. JetBlue has submitted a report of a handwriting expert stating that (by comparison to Rodriguez's signature on various personnel records) the signature on the ATF is Rodriguez's.

the form, filled out and signed by Malik, states: "Employee refuses to sign screen test results. Employee also refused to complete confirmation test." *Id.*[10]

POST-INCIDENT EVENTS

The following facts are not in dispute. David R. accompanied Rodriguez and the paramedics to the emergency room at Jamaica Hospital. After Rodriguez was discharged, he and David R. returned to the JFK crew

---

[10] On October 13, 2011, at 6:50 p.m., Malik emailed Stacy Greenfield, JetBlue's Manager of Employment, Compliance, and Drug Abatement, under the caption "Reasonable Suspicion," with the following account:

> . . . I arrived at JFK at 8:15am . . . The second person to be tested was [Rodriguez]. The screen test was done at 8:49am, and the results were .048. I asked the crewmember to sign the test results, when at that moment he collapsed to the floor. I instructed [David R.] to call 911, and I attempted to talk to the crewmember. After examining him, the paramedic determined the crewmember was alert and could continue the testing procedure. I asked the crewmember to complete the confirmation test, and he refused. I informed him that refusing to complete the test would be considered a refusal and would have the same consequences as a positive test result. The crewmember refused again, and asked to leave. At that point I documented the incident on the alcohol testing form, and ended the test. Both crewmembers were escorted out of the office by the inflight supervisor.

Dkt. # 58-16.

An email from Ayala at 12:28 p.m. earlier that day is consistent with Malik's account that Rodriguez took and failed the first test, but is inconsistent regarding details of his alleged refusal to take a confirmation test. She states that David R. told her that Malik told him that the refusal occurred "*before* he fell to the ground." Dkt. # 58-13 at 3 (emphasis added).

lounge, where an unnamed supervisor presented Rodriguez with a "guidance report form" confirming that he had failed the first Breathalyzer test and had refused to take a confirmation test. Rodriguez states that he did not believe the information in the guidance report was accurate, and therefore refused to sign it.[11]

### *JetBlue's Termination of Rodriguez*

On October 13, 2011, the following note was entered in Rodriguez's JetBlue personnel file (PF): "Roberto was late to his aircraft today and was tested for alcohol use under reasonable suspension (sic). He tested positive to his first test and refused a confirmatory test. He been (sic) removed RPI pending a termination recommendation. See attached message files for details." PF (Dkt. # 62-1) at 32.[12] On October 14, 2011, Anthony Rios, Rodriguez's supervisor at Logan Airport, requested confirmation of Rodriguez's (and S.M.'s) positive test results from Stacy Greenfield. Rios explained that he required confirmation of the positive test "for the termination recommendations." *Id.* On October 17, 2011, Greenfield responded, confirming that "[S.M.] and [Rodriguez] had positive alcohol tests (reasonable suspicion) on October 13, 2011." *Id.* at 38. On October

---

[11] The guidance report reflects his refusal to sign. *See* Dkt. # 62-7.

[12] The attached message file is represented by an outlook email icon and entitled "CM [S.M.] CM Rodriguez Taveras 83114." *Id.*

25, 2014, in an email captioned "Robert Rodriguez #83114 – Termination," Greenfield wrote, "I have reviewed all of the required paperwork regarding Inflight Crewmember Roberto Rodriguez DOT Reasonable Suspicion 'Refusal.' Roberto's initial DOT test was positive; he refused to take the confirmation test. In accordance with JetBlue Airways' zero tolerance policy, please proceed with termination." *Id.* at 39. The next entry in the PF is a "Termination Review Package Checklist." *See id.* at 40. It notes the reason for termination as a "violation of company policy." *Id.* A "Termination Recommendation" (undated) describes the "trigger incident" for termination as follows: "On October 13, 2011, a reasonable suspicion breathalyzer test was performed on [Rodriguez] by JetBlue's Anti-Drug and Alcohol Department. Anti-Drug and Alcohol informed inflight leadership that Roberto's test results were positive and to suspend Robert pending investigation." *Id.* at 41. The last entry in the PF is an October 31, 2011 letter from Greenfield to Rodriguez. In it, Greenfield wrote:

> Recently you declined to participate in a federally-mandated drug and/or alcohol test as outlined in either 49 C.F.R. Part 40 or 14 C.F.R. Part 120. As you are aware, your declining to take the required test is considered a refusal to submit and therefore is considered prohibited conduct under the [FAA] and JetBlue Corporate Policy.

*Id.* at 46. She provided information in the letter about conditions Rodriguez would be expected to meet if he pursued employment in a

"safety-sensitive" position in the future. She also gave Rodriguez contact information for a substance abuse professional. *Id.*

On November 8, 2011, Rodriguez filed an administrative charge with the EEOC, describing the events of October 13, 2011, as follows: "[JetBlue] subjected [Rodriguez] to a test, upon suspicion of the use of alcohol. However, after the initial test, RODRIGUEZ suffered an epileptic seizure. Contrary to the disciplinary October 13, 2011 memorandum, RODRIGUEZ did not refuse a confirmation test; he was unable to take a confirmation test based upon his disability." Dkt. # 11 at 17.

## DISCUSSION

### *Summary Judgment Standard*

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In this context, 'genuine' means that the evidence is such that a reasonable jury could resolve the point in favor of the nonmoving party." *Rodriguez-Pinto v. Tirado-Delgado*, 982 F.2d 34, 38 (1st Cir. 1993). A material fact is one which has the "potential to affect the outcome of the suit under applicable law." *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 703 (1st Cir. 1993). "[T]he mere existence of *some* alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) (emphases in original). Finally, Fed. R. Civ. P. 56(c) "mandates the entry of summary judgment . . . upon motion against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).

### The Americans with Disabilities Act

To obtain relief under the ADA,[13] a plaintiff must first establish that he or she: (1) suffered from a disability within the meaning of the ADA, (2) was "otherwise qualified to perform the essential functions" of the job "with or without reasonable accommodation," and (3) was subject to an adverse employment action. *Benoit v. Tech. Mfg. Corp.,* 331 F.3d 166, 176 (1st Cir. 2003). The parties do not dispute that epilepsy qualifies as a disability under the ADA. Additionally, Rodriguez is able to perform the essential

---

[13] A prima facie case of disability discrimination under Massachusetts law requires proof of virtually identical elements as under federal law. *See Blare v. Husky Injection Molding Sys. Boston, Inc.,* 419 Mass 437, 441 (1995).

functions required of a flight attendant, as, prior to his termination, he had performed the job successfully despite any disability.[14]

A plaintiff also bears the initial burden of showing that the adverse employment action was the result of unlawful discrimination. In other words, Rodriguez must prove that JetBlue took the adverse employment action "in whole or in part because of his disability." *Katz v. City Metal Co., Inc.*, 87 F.3d 26, 30 (1st Cir. 1996). A plaintiff may meet this burden either by presenting direct evidence of discriminatory animus, or, because "direct evidence of intentional discrimination is hard to come by," *Price Waterhouse v. Hopkins,* 490 U.S. 228, 271 (1989) (plurality opinion) (O'Connor J., concurring), by invoking the burden-shifting framework set out in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Tobin v. Liberty Mut. Ins. Co.,* 433 F.3d 100, 104 (1st Cir. 2005) (noting approval of the use of the *McDonnell-Douglas* framework "in connection with ADA claims of disability discrimination"). As Rodriguez has not come forward

---

[14] While JetBlue contests this point in its memorandum (arguing that Rodriguez is not eligible for a safety-sensitive position because he could allegedly succumb to a seizure at any moment), in light of Rodriguez's incident-free employment history as a flight attendant, the court will assume for purposes of summary judgment that he satisfies the second prong of the prima facie case.

with direct evidence of discrimination, the court will proceed in accordance with *McDonnell-Douglas.*[15]

Under the *McDonnell-Douglas* framework, once a plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to "articulate a legitimate, non-discriminatory reason for its employment decision and to produce credible evidence to show that the reason advanced

---

[15] Rodriguez misapprehends the line of cases that draw a dichotomy between "direct" and "indirect" evidence of unlawful discrimination; he argues that he can prevail on a "direct evidence" theory (which has the practical effect of shifting the burden of persuasion from the employee to the employer to prove that it would have made the same employment decision even if it had not taken the protected characteristic into account), by simply stating that "Mr. Rodriguez was terminated because he had an epileptic seizure brought about by JetBlue refusing to allow Mr. Rodriguez to take his medication that in turn prevented him from completing the alcohol test. JetBlue terminated him because of a seizure and then falsely called the seizure a 'refusal.'" Pl.'s Opp. at 16. Stripped of its conclusory characterizations of JetBlue's motivation, this "direct evidence" distills down to two concrete factual allegations: (1) JetBlue refused to allow Rodriguez to take his medication, which prevented him, because of a seizure, from completing the alcohol test, and (2) JetBlue labeled the seizure a "refusal." These facts do not constitute the type of *direct* evidence "which, if believed, results in an inescapable, or at least highly probable, inference that a forbidden bias was present in the workplace." *Johansen v. NCR Comten, Inc.,* 30 Mass. App. Ct. 294, 299 (1991) (acknowledging that the term "direct" evidence is something of a misnomer, but that it refers to facts such as policies identifying a protected class, derogatory slurs or discriminatory comments made about a protected class, or repeated evidence of a "pervasively [discriminatory] attitude"); s*ee also Fernandes v. Costa Bros. Masonry,* 199 F.3d 572, 583 (1st Cir. 1999) (noting that statements by decision makers that directly reflect the alleged animus and bear squarely on the contested employment decision can be deemed direct evidence).

was the real reason." *Tobin,* 433 F.3d at 105. If the employer meets its burden of production and offers such a reason, "the initial inference of discrimination evaporates, and the burden then shifts back to the plaintiff to 'proffer evidence to establish that [the] non-discriminatory justification is mere pretext, cloaking discriminatory animus.'" *Freadman v. Metro. Prop. & Cas. Ins. Co.,* 484 F.3d 91, 99 (1st Cir. 2007), quoting *Tobin,* 433 F.3d at 105 (internal citations omitted).

### *JetBlue's Non-discriminatory Reason*

Anticipating that Rodriguez might succeed in making a prima facie case of disability discrimination,[16] JetBlue has come forward with a nondiscriminatory reason for taking the adverse employment action that it did. JetBlue alleges that Rodriguez was terminated because of management's reasonable belief that he had "failed an initial Breathalyzer test, and [had] refused to take a confirmation test . . . in violation of JetBlue's zero tolerance policy on alcohol use." Def.'s Mem. at 19.[17]

---

[16] JetBlue argues that Rodriguez has not presented any evidence to establish an inference that "any activity related to his disability" had any causal relationship to his termination, and that he therefore cannot establish a prima facie case. The court will give Rodriguez the benefit of doubt on this issue.

[17] JetBlue also alleges that it was "required by federal law to remove Plaintiff from duty" in accordance with Federal Aviation Administration and Department of Transportation regulations. *Id.* at 16-18. The parties

JetBlue maintains that the fact that Rodriguez has epilepsy did not factor into Greenfield's decision to fire him, and that Greenfield and other JetBlue management made the decision to terminate Rodriguez after considering a number of sources of credible information, including: (1) contemporaneous emails from Ayala, a phone call from David R., and the signs and symptoms report form, all of which confirmed that Ayala and David R. suspected that Rodriguez and S.M. were intoxicated when they reported late for duty on the morning of October 13, 2011; (2) the results of Breathalyzer tests confirming that S.M. and Rodriguez had elevated blood alcohol levels exceeding JetBlue's authorized limit (as evidenced, in the case of Rodriguez, by the ATF showing a Breathalyzer test result of 0.048, and containing the statement that Rodriguez had refused a second test); (3) emails from the Breathalyzer technician[18] confirming the results listed on the ATF and corroborating Rodriguez's refusal to take a second test.[19] This

_____

contest what is required by the regulations in this regard. The court need not resolve this dispute.

[18] Rodriguez also moves to strike the emails from Malik as inadmissible hearsay. The motion overlooks the fact that the emails are not offered for their truth, but to demonstrate one of the grounds on which Greenfield relied in making the termination decision. Consequently, the motion is denied.

[19] The court declines to consider other evidence that JetBlue gathered during the litigation suggesting that Rodriguez may have violated its 8-hour

15

evidence is more than sufficient to satisfy JetBlue's burden of production in articulating a nondiscriminatory reason for the adverse employment action.

### Evidence of Pretext

At this step of the burden-shifting analysis, Rodriguez must "demonstrate that the proffered reason was not the true reason for the employment decision." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *see also Blare*, 419 Mass. at 447 (noting that at this stage a plaintiff must "produce evidence sufficient to support a jury verdict that it was more likely than not that the articulated reason was pretext for actual discrimination."). This final burden shift "merges with the ultimate burden of [persuasion]," and a plaintiff may offer evidence to directly prove that "a discriminatory reason more likely motivated the employer," or may attempt to expose pretext "by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. Rodriguez has chosen the second tack, focusing his argument on disputed facts about the events of October 13, 2011, and on alleged discrepancies in the various JetBlue documents offered in support of his termination.

---

no alcohol policy, as the discovery of this evidence post-dates JetBlue's employment decision. *See McKennon v. Nashville Banner Pub. Co.,* 513 U.S. 352, 359 (1995) (noting that an employer may not proffer evidence of employee misconduct uncovered after the adverse job action is taken).

In the first instance, Rodriguez denies that he took any Breathalyzer test at all, relying on a sworn affidavit that he has no recollection of taking such a test. For obvious reasons, the "mere lack of recollection does not suffice" to generate a *genuine* dispute of material fact. *I.V. Servs. of Am., Inc. v. Inn Dev. and Mgmt., Inc.*, 182 F.3d 51, 55 (1st Cir. 1999). While all plausible inferences are to be drawn in favor of a non-moving party on summary judgment, "the opponent is not entitled to have the moving party's evidence positively disbelieved" in the absence of any specific facts to discredit it. *Grubb v. KMS Patriots, L.P.*, 88 F.3d 1, 4 (1st Cir. 1996). Rodriguez offers no facts discrediting the printout of his Breathalyzer result or the emails and contemporaneous correspondence from multiple eyewitnesses that consistently refer to Rodriguez taking the test with a .048 result. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ("[A]n employer would be entitled to judgment as a matter of law" if there is "abundant and uncontroverted" (or barely controverted) evidence that a nondiscriminatory reason explains the employer's decision). It will be remembered that Rodriguez signed a prior statement, under penalty of perjury, admitting that he *did* take a Breathalyzer test, and only "after the initial test" did he suffer a seizure. The court is not required — and in fact it would be unfair to the opposing party — to treat a party's repudiation of his

17

own prior sworn statement as creating a genuine dispute of material fact. *See Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994) ("When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.").

As a fallback position, Rodriguez alleges that his final termination letter from JetBlue misconstrued his inability to take the confirmation test as a "refusal" to submit to the alcohol testing. Even assuming that this is true, it is immaterial.[20] Rodriguez does not allege that the individuals who made the ultimate decision to terminate him *knew* (or even suspected) that his actions had been misconstrued. And assuming that an error was in fact made, Rodriguez offers no evidence that could lead a reasonable jury to believe that the error was motivated by discriminatory animus.

---

[20] Although there is ample evidence in the record to support JetBlue's assertion that Rodriguez *did* refuse the confirmation test, there does remain a genuine dispute of fact about whether Rodriguez was unable, because of an epileptic seizure, to take the test, or whether his inability to take it was misconstrued as an affirmative refusal. The court is constrained for summary judgment purposes to accept as fact that Rodriguez either did not actually "refuse" to take the second test or that he did not intend to communicate any refusal to do so. Nevertheless, this dispute of fact is not material, as is explained.

Moreover, even crediting Rodriguez's unsupported accusations that Malik intentionally lied on the ATF, forged Rodriguez's signature, and lied in his recounting of the test to the paramedics, Ayala, and to Greenfield, he offers no plausible motive for Malik to have done so, much less a reason to impute Malik's allegedly malicious behavior to JetBlue. (It will be remembered that S.M., who was tested by Malik together with Rodriguez, was also terminated by JetBlue for violating the zero tolerance policy). The focus of the court's analysis is not on Malik and his motives, but on the state of mind of the supervisors and managers who made the decision to terminate Rodriguez, and what was known to them when they did. *See, e.g., Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991) ("In assessing pretext, a court's 'focus must be on the perception of the decision maker,' that is, whether the employer believed its stated reason to be credible.").

In other words, the record is bereft of any evidence to suggest that JetBlue's decision was motivated by anything other than adherence to its "zero-tolerance" policy and the reasonable belief that Rodriguez had violated that policy. That JetBlue may have been mistaken is not the issue. The anti-discrimination laws are exactly that. They are not a vehicle for litigating the soundness of an employer's personnel decisions so long as

they are motivated by reasons that are nondiscriminatory. *See Tardanico v. Aetna Life & Cas. Co.*, 41 Mass. App. Ct. 443, 448 (1996) ("The employer's reasons need not be wise, so long as they are not discriminatory and they are not pretext."); *see also Mesnick*, 950 F.2d at 825 (courts "may not sit as super personnel departments, assessing the merits — or even the rationality — of employers' nondiscriminatory business decisions").

### *Reasonable Accommodation and FMLA claims*

While evidence of discriminatory animus is not an element of an ADA reasonable accommodation claim, an employee must "explicitly request an accommodation," and must "provide sufficient information to put the employer on notice of the need for accommodation." *Jones v. Nationwide Life Ins. Co.,* 696 F.3d 78, 89 (1st Cir. 2012). The request must be "sufficiently direct and specific" and "must explain how the accommodation requested is linked to plaintiff's disability." *Id.* Rodriguez fails to state a claim for failure to accommodate because he has not alleged that he made any request for an accommodation from JetBlue.[21] Similarly, Rodriguez cannot point to any FMLA request that could possibly explain his

---

[21] Rodriguez provides no more than a statement in his opposition memorandum that "[t]he accommodation was the permitting of Mr. Rodriguez to take his medication prior to the breathalyzer test." Pl.'s Opp'n at 18.

termination — the evidence is overwhelmingly that an explicit request was never made prior to JetBlue's decision.

Finally, there is no support for Rodriguez's allegation that JetBlue's employee handbook (called the "Bluebook") formed a "contract," and if it did, that any of its terms were breached. Rodriguez was told he was an at-will employee and he does not dispute that fact. An at-will employee may, with two limited exceptions (neither of which apply to Rodriguez), be terminated for any non-discriminatory reason or for no reason at all. *Jackson v. Action for Boston Cmty. Dev. Inc.*, 403 Mass. 8, 9 (1988).

ORDER

For the foregoing reasons, JetBlue's motion for summary judgment is ALLOWED. The Clerk will enter judgment for JetBlue on all claims and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE